**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PROTECTIVE ADMINISTRATIVE SERVICES, INC., | No. 56093-3-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | |
| Respondent. | |

MAXA, J. – Protective Administrative Services, Inc. (Protective) appeals the superior court's grant of summary judgment in favor of the Department of Revenue (DOR). Protective had challenged DOR's determination that transactions in which vehicle dealers sold Protective's vehicle service contracts (VSCs) to vehicle buyers constituted retail sales by Protective to the vehicle buyers rather than wholesale sales to the dealers.

Protective sells and administers extended warranties, referred to as VSCs. Protective entered into agreements with vehicle dealers to sell the VSCs to the dealers' customers. Pursuant to those agreements, Protective provided dealers with blank VSC registration documents, contract forms, and rate sheets showing the "net dealer cost" – the amount the dealers were required to pay Protective for each VSC. Dealers then sold the VSCs in conjunction with the

No. 56093-3-II

sale of vehicles. Dealers determined the retail price they charged their customers for the VSCs and retained the difference between the retail price and the net dealer cost paid to Protective.

After an audit, DOR determined that Protective was engaged in retail sales of the VSCs to the dealers' customers and that the dealers were acting as Protective's sales agents. As a result, DOR assessed business and occupation (B&O) taxes on the full retail price of the VSCs rather than just on the amount of the net dealer cost payments that Protective received. In addition, DOR required Protective to pay an estimated amount of sales taxes on the retail sales that dealers had not collected. Protective challenged these assessments, and the superior court granted summary judgment in favor of DOR.

We hold that under the applicable statutes and DOR regulations, Protective made wholesale sales of VSCs to vehicle dealers rather than retail sales to the dealers' customers. Accordingly, we reverse the superior court's order granting summary judgment in favor of DOR and remand for the superior court to grant summary judgment in favor of Protective.[1]

FACTS

*Vehicle Service Contracts*

Protective's business involves entering into VSCs with buyers of new or previously owned vehicles and then administering those VSCs. The VSCs are extended warranties under which Protective agrees to pay or reimburse the costs of repairing or replacing certain covered mechanical problems that arise regarding the subject vehicle during certain periods. VSCs are

---

[1] As an alternative ground for granting the tax refund, Protective also argues that it must be deemed a wholesale seller as a matter of law under RCW 82.04.480(1). Because we conclude based on other provisions that Protective was making wholesale sales, we do not address this argument.

No. 56093-3-II

available in several options based on length of time, number of miles, and/or covered parts and services.

To market the VSCs, Protective entered into VSC program dealer agreements with vehicle dealers. Under this agreement, the dealer agreed to "use its best efforts to solicit or provide" VSCs to its customers. Clerk's Papers (CP) at 131. Protective provided blank registration pages and contract forms to the dealer. Protective also provided a rate chart showing the amount the dealer would have to pay Protective when it sold a VSC, referred to as the "net dealer cost." CP at 293. The agreement expressly stated that the dealer's relationship with Protective "shall be that of independent contractor" and nothing in the agreement or relationship "shall be construed as creating the relationship of principal and agent." CP at 132.

The dealers generally determined how and for how much the VSCs were sold without any direction from Protective. When the dealer sold a VSC in conjunction with a customer's purchase of a vehicle, the dealer in its sole discretion determined the retail price charged to its customer. The cost of the VSC was listed on the standard vehicle buyer's order and was included in the total sale price of the vehicle. The customer generally financed the total sale price less any down payment.

At the time of the sale, the dealer completed the VSC registration form provided by Protective with information about the purchaser, the vehicle, and the type of coverage selected. The customer would sign the form as evidence of the contract with Protective. The dealer then would send the completed registration form to Protective along with the amount of the net dealer cost. The dealer's profit was the difference between the retail price and the net dealer cost.

In addition to entering into the VSCs, Protective administered them. If the customer subsequently needed services or repairs that were covered under the VSC, the dealer or a repair

3

No. 56093-3-II

shop confirmed with Protective that the repairs were covered under the agreement and performed the work.  Protective then reimbursed the dealer or repair shop for the costs of services provided.

*DOR Audit and Assessments*

DOR discovered Protective had not been paying any B&O taxes even though it was a registered VSC provider in Washington.  DOR commenced an audit of Protective for the period of January 1, 2010 through June 30, 2014.  DOR determined that Protective was a retail seller of VSCs and therefore was responsible for retail B&O taxes and for retail sales taxes not collected by dealers.

DOR assessed retail B&O tax in the amount of $362,485 based on the total amount of VSC retail sales rather than a lesser amount based on the net dealer costs that Protective received.  DOR also investigated whether the dealers that sold the VSCs collected sales taxes on those sales as required.  DOR noted that because Protective was a retail seller, it remained responsible for any uncollected sales taxes.  Because Protective did not have any business records showing whether dealers had collected sales taxes on VSC sales, DOR had to estimate the amount of uncollected sales taxes.  Using estimates and assumptions, DOR assessed retail sales taxes against Protective in the amount of $191,680.

Protective requested an internal administrative review of the assessments.  DOR sustained the assessments and denied a subsequent request for reconsideration.

*Superior Court Ruling*

Protective paid the contested assessment and filed a tax refund action in superior court under RCW 82.32.150 and RCW 82.32.180.  Protective and DOR filed cross-motions for summary judgment.

4

No. 56093-3-II

DOR submitted evidence regarding how Protective accounted for the total retail price and the net dealer cost of the VSCs. DOR referenced a sales data report that Protective produced that separately stated the retail price and the dealer markup of VSCs sold. An email from a Protective vice president referred to the dealer markup as the dealer's "commission." CP at 184. In an interrogatory answer, Protective stated that the dealer's markup was credited to an income account and debited to an account labeled "Dealer Commissions." CP at 523.

In a deposition, Gregg Cariolano – Protective's chief financial officer – confirmed that Protective's standalone accounting statements recorded the full retail price of the VSCs as revenue and the dealer markup was debited to a dealer commission account. However, he stated that in normal accounting for Protective's parent company, only the net dealer cost was reported as revenue.

Cariolano subsequently submitted a declaration that explained Protective's accounting practices. He stated that Protective was required to track certain information regarding the VSC sales because of regulations in various states. But in the independently audited financial statements of Protective's parent company, Protective Life Company, only the net dealer cost was reported as revenue. Dealer markup was not recorded as either revenue or as an expense in those financial statements. This is because Protective was legally entitled to receive only the net dealer cost, not the dealer markup. Cariolano emphasized that Protective's internal financial statements, which showed dealer markup as revenue with an offsetting expense, did not reflect the economic reality of VSC sales because Protective was not legally entitled to the dealer markup.

The superior court granted DOR's summary judgment motion and denied Protective's cross-motion. The court ruled that Protective's VSC sales were retail sales to the dealers'

5

No. 56093-3-II

customers and not wholesale sales to the dealers. The court emphasized the timing of the sales at issue, noting that the VSCs were "sold to the buyer at the time the buyer was also purchasing a vehicle, then the dealer notified Protective of the sale, [and] remitted the cost of the specific extended warranty to Protective." Report of Proceedings at 43.

Protective appeals the superior court's grant of summary judgment in favor of DOR.

ANALYSIS

A.      STANDARD OF REVIEW

We review a superior court's order granting summary judgment de novo. *Maxwell v. Atl. Richfield Co.*, 15 Wn. App. 2d 569, 574, 476 P.3d 645 (2020), *review denied sub nom., Maxwell v. Brand Insulations, Inc.*, 197 Wn.2d 1005, 483 P.3d 779 (2021). We review the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Id.* at 575. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c).

Here, the parties do not dispute the material facts. Accordingly, the issue before us is whether the superior court correctly determined that Protective was not entitled to a tax refund, which is a question of law that we review de novo. *Bravern Residential, II, LLC v. Dep't of Revenue*, 183 Wn. App. 769, 776, 334 P.3d 1182 (2014).

A taxpayer must prove that the tax paid was incorrect and prove the correct amount of tax in order to establish that they are entitled to a refund. RCW 82.32.180. In order to determine whether the tax paid here was correct, we must interpret the applicable statutes and DOR regulations regarding wholesale and retail sales, which are questions of law that we review de novo. *See Bravern*, 183 Wn. App. at 776.

6

No. 56093-3-II

B.      STATUTORY AND REGULATORY FRAMEWORK

1.      B&O Tax and Sales Tax

Washington imposes a B&O tax on companies for the privilege of engaging in business activities in the state.  RCW 82.04.220(1).  For product sellers, the tax is measured by the application of various rates against gross proceeds of sales.  RCW 82.04.220(1).  Higher B&O tax rates are applied to persons selling at wholesale rather than to persons selling at retail.  RCW 82.04.270 (0.484 percent for wholesalers); RCW 82.04.250(1) (0.471 percent for retailers).  However, wholesalers must pay B&O taxes only on the gross proceeds of wholesale sales.  RCW 82.04.270.  Retailers must pay B&O taxes on the gross proceeds of all retail sales.  RCW 82.04.250(1).

RCW 82.08.020(1)(d) states that retail sales tax applies to "each retail sale" of extended warranties.  "Each seller must collect from the buyer the full amount of the tax payable in respect to each taxable sale."  RCW 82.08.050(1).  For wholesale sales, the reseller will "collect the retail sales tax from the customer, and remit it along with retailing B&O tax to the department."  WAC 458-20-257(4)(b)(i)-(ii), (c).

2.      Wholesale Sale vs. Retail Sale

A retail sale is the sale of tangible personal property to all persons other than for the purpose of resale.  RCW 82.04.050(1)(a)(i).  Under RCW 82.04.050(7), a retail sale also includes the sale of an "extended warranty" to a "consumer."  RCW 82.04.050(7) defines "extended warranty" as follows:

> [A]n agreement for a specified duration to perform the replacement or repair of tangible personal property at no additional charge or a reduced charge for tangible personal property, labor, or both, or to provide indemnification for the replacement or repair of tangible personal property, based on the occurrence of specified events. *The term "extended warranty" does not include an agreement, otherwise meeting the definition of extended warranty in this subsection, if no separate charge is made*

7

No. 56093-3-II

> *for the agreement and the value of the agreement is included in the sales price of the tangible personal property covered by the agreement.*

(Emphasis added.) A "consumer" includes any person who purchases an extended warranty as defined in RCW 82.04.050(7) other than for resale. RCW 82.04.190(1)(e).

A wholesale sale is "[a]ny sale, which is not a sale at retail, of . . . (f) Extended warranties as defined in RCW 82.04.050(7)." RCW 82.04.060(1)(f).

RCW 82.04.470(1) states, "The burden of proving that a sale is a wholesale sale rather than a retail sale is on the seller." One way to meet this burden is to show that a seller obtained from the buyer a copy of the buyer's "reseller permit," RCW 82.04.470(1), or in other specified ways, RCW 82.04.470(2)-(4). However, RCW 82.04.470(5) states that a seller also "may meet its burden of proving that a sale is a wholesale sale rather than a retail sale by demonstrating facts and circumstances, according to rules adopted by [DOR], that show the sale was properly made without payment of retail sales tax." In assessing whether a seller has met this burden, DOR will consider all evidence the seller presents, including the circumstances of the sales transaction, the nature of the buyer's business, the nature of the items sold, and other available documents like purchase orders. WAC 458-20-102(7)(h).

WAC 458-20-257 (Rule 257) explains the tax treatment of persons selling services covered by warranties and service contracts, referred to in the rule as "agreements." Rule 257 states that income from agreements sold to consumers is subject to both B&O tax and retail sales tax. WAC 458-20-257(4)(a). And "[s]ellers of agreements . . . to consumers are responsible for collecting the retail sales tax from the consumers, and remitting it and retailing B&O tax to [DOR]." WAC 458-20-257(4)(a). Subsection (4)(a) further provides,

> *If a seller is acting as agent or broker for another party*, such as the actual warrantor, the seller is still liable for collecting the retail sales tax from the buyer and remitting it to [DOR]. In this case, the seller as an agent or broker of the

8

No. 56093-3-II

> warrantor normally receives a commission. Commission income is taxable under the service and other business activities B&O tax classification . . . . The warrantor's gross income on the sale is taxable under the retailing B&O tax classification. There is no deduction allowed for the commission paid to the agent or broker.

WAC 458-20-257(4)(a) (emphasis added).

Regarding wholesale sales, subsection (4)(b) of Rule 257 states, "Sales of agreements can be made at wholesale when the buyer will be reselling the agreement without intervening use, or including the agreement in the sale of tangible personal property, and the seller takes from the buyer a copy of the buyer's reseller permit." WAC 458-20-257(4)(b). A reseller permit is documentation that DOR issues to businesses that make wholesale purchases in order to substantiate a wholesale purchase. WAC 458-20-102(1)-(2).

Subsection (4)(b) of Rule 257 provides several examples to illustrate when the sale of an extended warranty is considered a wholesale sale. Example 1 states,

> An automobile dealer sells a vehicle to a customer for a selling price of $20,000 that includes a manufacturer's limited five years or 50,000 miles warranty. The automobile dealer extends coverage for an additional two years, as a bonus to the customer. When the automobile dealer purchases the two-year agreement from a warranty provider, with the intent to sell the agreement along with the sale of the vehicle to the customer, the purchase of the extended warranty by the automobile dealer is for resale.

WAC 458-20-257(4)(b).

Example 2 states,

> A home improvement store (store) sells a lawnmower to a customer. The store also makes available for purchase a manufacturer's agreement for extended coverage. The customer decides to purchase an agreement from the store for the lawnmower. As the store is reselling the agreement, the store may purchase it at wholesale from the manufacturer with the use of a reseller permit. Both the sales of the lawnmower and agreement to the customer are taxable retail sales. The store will collect the retail sales tax from the customer, and remit it along with retailing B&O tax to the department.

WAC 458-20-257(4)(b)(i).

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56093-3-II

Example 3 states,

> For a special holiday sale, the home improvement store in Example 2 purchases the manufacturer's extended warranties to provide with the sales of lawnmowers. The store makes no intervening use of the extended warranties, and does not charge customers for the warranties. The warranty purchases by the store are wholesale purchases as long as the store provides a copy of its reseller permit to the manufacturer. The store is not the consumer of the warranties as the warranties are provided to customers as a condition of purchase of the lawnmowers. The store will collect retail sales tax, from the customers on the sales of the lawnmowers, and remit it along with retailing B&O tax to the department.

WAC 458-20-257(4)(b)(ii).

> Subsection (4)(c) of Rule 257 further states,

> When an agreement is purchased by a manufacturer, wholesaler, or retailer to be included in the sale of tangible personal property, the purchase of the agreement can be made at wholesale with the use of a reseller permit. In this instance, the manufacturer, wholesaler, or retailer is not the consumer of the warranty. When the retailer sells the tangible personal property including the agreement, it will collect the retail sales tax from the customer and remit it and the retailing B&O tax to the department.

WAC 458-20-257(4)(c). Example 4 states, "If a vehicle wholesaler sells a vehicle to a retailer and includes an agreement with the sale, the sale of the vehicle with agreement is a wholesale sale . . . . The retailer must provide the wholesaler with a reseller permit." WAC 458-20-257(4)(c).

> Finally, subsection (5) of Rule 257 addresses sales by third parties,

> Consideration received by a third party as a commission, for selling an agreement for the actual warrantor, is generally subject to tax under the service and other activities tax classification. In this situation, the third-party seller never takes possession of the agreement, and the warrantor maintains liability for the provisions of the agreement.

> (a) **Responsibility for payment of retailing B&O tax.** The warrantor is subject to retailing B&O tax on the gross sales price received from the sales of agreements by third parties. No deduction is allowed for commissions paid to third parties.

10

No. 56093-3-II

(b) **Responsibility for collection of retail sales tax.** The third party is responsible for collecting the retail sales tax from the buyer and remitting it, along with service and other activities B&O tax on its commission income, to [DOR].

WAC 458-20-257(5).

3.    Statutory and Regulatory Interpretation

A determination of whether Protective was a wholesaler requires interpretation of various RCW's and WAC's.  Statutory interpretation is a matter of law, and we review the interpretation of statutes de novo.  *Ekelmann v. City of Poulsbo*, 22 Wn. App. 2d 798, 807, 513 P.3d 840 (2022).  Our goal in interpreting a statute is to determine the legislature's intent and give effect to it.  *Id.*  "We consider the language of the statute, the context of the statute, related statutes, and the statutory scheme as a whole."  *Id.*  In addition, we attempt to give effect to all the statutory language and to avoid rendering any portion of the statute meaningless or superfluous.  *Id.*

When interpreting regulations, we follow the same rules we use to interpret statutes.  *City of Puyallup v. Pierce County*, 8 Wn. App. 2d 323, 333, 438 P.3d 174 (2019).  " '[O]ur paramount concern is to ensure that the regulation is interpreted consistently with the underlying legislative policy of the statute.' "  *Rios-Garcia v. Dep't of Soc. & Health Servs.*, 18 Wn. App. 2d 660, 670, 493 P.3d 143 (2021) (quoting *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 52, 239 P.3d 1095 (2010)).

C.    CLASSIFICATION OF EXTENDED WARRANTY SALES

Protective argues that it is entitled to a refund for the assessed B&O taxes and retail sales taxes because its VSC sales should have been classified as wholesale sales to the vehicle dealers.  Therefore, its B&O taxes should have been based on total net dealer costs rather than on total retail sale prices.  DOR argues that the assessments were correct because the sale of VSCs were retail sales to the dealers' customers.  We agree with Protective.

11

No. 56093-3-II

Under RCW 82.04.470(1), Protective has the burden of proving that its sales of VSCs were wholesale sales. We conclude that Protective has met this burden.

WAC 458-20-257(4)(b) states that "[s]ales of agreements can be made at wholesale when the buyer will be reselling the agreement without intervening use." The dealers clearly sell the VSCs to their customers without intervening use. Therefore, under subsection (4)(b), Protective's sales "can be" wholesale sales subject to the guidance from the examples in Rule 257.

The facts in example 2 in Rule 257, which provides a scenario in which sales of agreements are wholesale sales, are almost identical to the facts here. The home improvement store in example 2 sells a lawnmower to a customer. Similarly, the dealer here sells a vehicle to a customer. The store in example 2 makes available for purchase a manufacturer's extended coverage agreement. Similarly, the dealer here makes available for purchase Protective's VSC. The customer in example 2 decides to purchase an agreement from the store for the lawnmower. Similarly, the customer here decides to purchase a VSC from the dealer for the vehicle. If the scenario in example 2 constitutes a wholesale sale, Protective's VSC sale here also must constitute a wholesale sale.

The one caveat regarding application of WAC 458-20-257(4)(b) and example 2 is that both refer to the use of a reseller permit. DOR argues that a seller can be deemed a wholesaler under Rule 257 only if that seller receives a reseller permit from the buyer. However, RCW 82.04.470(5) expressly states that a seller can meet its burden of proving that a sale is a wholesale sale without taking a reseller permit "by demonstrating facts and circumstances, *according to rules adopted by [DOR],*" that the sale was at wholesale. (Emphasis added.) We

12

No. 56093-3-II

interpret this provision as providing that WAC 458-20-257(4)(b) and example 2 can describe a wholesale sale even without a reseller permit.[2]

Based on WAC 458-20-257(4)(b) and example 2, we conclude that Protective was making wholesale sales of the VSCs to the dealers. DOR makes a number of arguments to support its position that Protective's sales of VSCs were retail sales, but these arguments do not compel a different conclusion.

First, DOR argues that the dealers were merely acting as agents of Protective and selling the VSCs in exchange for a commission. Therefore, WAC 458-20-257(4)(a) and (5) apply rather than WAC 458-20-257(4)(b). But this argument is inconsistent with the actual relationship between Protective and the dealers. A crucial factor in determining whether an agency relationship exists is "the right to control the manner of performance." *O'Brien v. Hafer*, 122 Wn. App. 279, 283, 93 P.3d 930 (2004). Here, Protective had almost no control over how the dealers marketed the VSCs. Protective merely provided blank copies of registration forms and contract forms. The dealers determined how and for how much the VSCs were sold without any direction from Protective. Most significant is the fact that the dealers set the retail price of the VSCs, meaning that if they were agents, they would be setting the amount of their own commission.[3] As Protective notes, "In what world is a sales commission determined by the unilateral pricing decision of the supposed sales agent?" Reply Br. at 11-12.

---

[2] In addition, example 1 in Rule 257 and RCW 82.04.470(5), which describe wholesale sales without mentioning a reseller permit, suggest that a seller can establish a wholesale sale even without a reseller permit.

[3] And the amounts of the dealer markups, which DOR refers to as commissions, generally were a significant percentage of the total retail price. The document in the record showing retail price and dealer markup reflects that the markup often was close to or greater than 50 percent of the retail price. In one sale the dealer markup was 83 percent, and in another the markup was 72 percent.

13

No. 56093-3-II

Consistent with this lack of control, the dealer agreements specifically stated that the dealers were not Protective's agents. Although contract language does not necessarily control, *Rho Co. v. Department of Revenue*, 113 Wn.2d 561, 570, 782 P.2d 986 (1989), here the dealer agreements were consistent with the nature of the relationship.

DOR argues that the fact that Protective recorded dealer markup as commissions in its internal bookkeeping shows that the dealers were acting as agents. But Protective explained that its internal bookkeeping was designed to satisfy the requirements of regulators in various states, and its formal financial statements did not treat dealer markup as income or a commission. And how Protective internally recorded the sales cannot control over the actual relationship between Protective and the dealers.

Second, DOR argues that Protective's VSC sales must be retail sales because Protective owed contractual obligations to the dealer's customer as the administrator of the VSC. However, nothing in the applicable statutes or in Rule 257 states or even suggests that this fact prevents the sale of an extended warranty from being a wholesale sale. More significantly, that fact is present in *every* sale of an extended warranty. If the warrantor's contractual obligation to the customer means that the sale must be a retail sale, there could never be a wholesale sale of an extended warranty. But RCW 82.04.060(1)(f) expressly states that there can be a wholesale sale of "extended warranties as defined by RCW 82.04.050(7)." We will not interpret a statute in a way that renders another statute superfluous. *Ekelmann*, 22 Wn. App. 2d at 807.

DOR acknowledges that there can be wholesale sales of extended warranties, but only identifies scenarios where the agreement is included with the sale of a product without an additional charge to the customer. However, these scenarios are expressly excluded from the definition of extended warranty in RCW 82.04.050(7). Although the sale of extended warranties

14

No. 56093-3-II

are included in the definition of retail sale under RCW 82.04.050(7), RCW 82.04.050(7) states that the term "extended warranty" does not include an agreement where "no separate charge is made for the agreement and the value of the agreement is included in the sales price." Therefore, a sale that is excluded from the definition of extended warranty in RCW 82.04.050(7) cannot be a retail sale and by default is a wholesale sale. DOR cannot point to any scenario where the sale of an extended warranty *as defined in RCW 82.04.050(7)* could be a wholesale sale if the warrantor's obligation to the customer is determinative. Therefore, DOR's argument necessarily must fail.

Third, DOR repeatedly claims that the dealer's customer was legally obligated to pay *to Protective* the full retail price of the VSC and Protective was entitled to receive the full retail price. But this claim is inconsistent with the facts of the VSC sale. The dealer included the retail price of the VSC in the vehicle buyer's order, along with the price of the vehicle and other charges. Under this vehicle buyer's order, the customer was obligated to pay *to the dealer* the full amount of total price indicated. In fact, the customer generally financed *with the dealer* the total price, including the price of the VSC. Further, under the dealer agreements, Protective was entitled to receive only the net dealer cost, not the full retail price.

Again, DOR emphasizes that Protective recorded the full retail price of the VSCs in its internal bookkeeping records. But Protective explained that there were reasons why internal bookkeeping tracked the amount of the retail sales despite having no legal obligation to receive those amounts and that in the formal financial statements only the net dealer costs were included as revenue. More significantly, how Protective internally recorded the sales cannot trump how the transactions actually occurred.

15

No. 56093-3-II

Fourth, DOR argues that Protective never actually made a sale to the dealers before the dealers sold the VSCs to their customers. Instead, there was only one sale – from Protective to the customers. DOR apparently claims that in order to be a wholesaler, Protective had to sell the VSCs to the dealers before the dealers sold them to their customers.

But we agree with Protective that the timing of the transactions is immaterial because Protective was acting similar to a "drop shipper." A drop shipment occurs when a seller "contracts to sell tangible personal property to a customer. The seller then contracts to purchase that property from a wholesaler and instructs that wholesaler to deliver the property directly to the seller's customer." WAC 458-20-193(301). Protective notes that many orders placed on Amazon.com are drop shipments, where Amazon sells a product but then contracts with the product supplier to ship directly to the customer. The transactions here are akin to drop shipments – a customer buys an extended warranty from the dealer and Protective fulfills the purchase by serving as obligor and the administrator of the warranty.

DOR taxes drop shipment suppliers as wholesalers. *See* WAC 458-20-193(301). And Department of Revenue Determination No. 08-0111, 27 WTD 221 (2008) indicates that drop shippers are wholesalers. In that case, the taxpayer operated a website where customers could purchase prescription drugs without visiting a physician. *Id.* at 221. Once the customer purchased the drug on the website, a pharmacy filled the prescription and shipped it to the customer. *Id.* at 222-23. The taxpayer charged the customer's credit card when the pharmacy shipped the drugs, and the taxpayer paid the pharmacy from the amount charged to the customer. *Id.* at 223. DOR's appeals division ruled that the pharmacy sold the drugs at wholesale to the taxpayer and the taxpayer sold at retail to the customer. *Id.* at 226. Therefore, the sale of the VSCs here did not have to occur before the sale of the vehicle to constitute a wholesale sale.

16

No. 56093-3-II

Fifth, DOR's attempts to distinguish example 2 in Rule 257 fail. DOR asserts that example 2 is distinguishable from Protective's case because the dealers here did not purchase the VSCs from Protective nor did it resell them to customers – there was only one transaction. But there was only one transaction in example 2 as well. The store sold the agreement at the same time as it sold the lawnmower. DOR also states that in example 2 presumably the customer owed the retail sales price to the store rather than to the manufacturer. But here, as discussed above, the customer also owed the retail sales price to the dealer rather than to Protective. The facts in example 2 are indistinguishable from the facts here.

We conclude that Protective's VSC sales to the vehicle dealers were wholesale sales. Accordingly, we hold that the superior court erred in granting summary judgment in favor of DOR and in denying Protective's summary judgment motion.

CONCLUSION

We reverse the superior court's order granting summary judgment in favor of DOR and remand for the superior court to grant summary judgment in favor of Protective.

_____
MAXA, J.

We concur:

_____
CRUSER, A.C.J.

_____
VELJACIC, J.

17